UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:13-CV-77-R

DAVID WILLIAMS,     PLAINTIFF

v.

UNION UNDERWEAR COMPANY, INC
d/b/a FRUIT OF THE LOOM,     DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court upon Defendant's Motion for Summary Judgment. (Docket #16). Plaintiff David Williams has responded, (Docket # 20) and Defendant has replied. (Docket #. 23). This matter is now fully briefed and ripe for adjudication. For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

David Williams was employed by Fruit of the Loom ("FOL") from March of 1983 through June of 1998, and then again from March of 2007 through his termination on December 31, 2011. He alleges disability discrimination in violation of the Americans with Disabilities Act ("ADA") and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). FOL rehired Williams in 2007 because he had experience with the Audit Compliance Language ("ACL") software that FOL was planning to implement as it launched its Office of Foreign Asset Control ("OFAC") compliance program. This program ensures that FOL does not trade with any prohibited entities. In his position as Senior Manager, Williams was responsible for maintaining the accuracy of the company's information, ran an OFAC compliance analysis two to three times a year, and conducted two to three licensee audits each year, which often required week-long travel.

1

In 2008, FOL engaged an accounting firm of Ernst & Young LLP to assess its Internal Audit Department. The accounting firm issued the FOL Internal Audit Blueprint for Improvement, which identified performance deficiencies in several areas. In response, the Audit Department was directed to "move away from manufacturing audits and to become more involved in process-oriented audits and to focus more on the overall strategic objectives of FOL." (Crossland Dep., p.11-12). "Members of the department, including Williams, were told they needed to increase standards, improve audit preparation, follow through more clearly, and produce work on a more timely basis." *Id.*.

During his employment with FOL, Williams's performance was reviewed by his supervisors on a 15 month cycle. His May 2008 evaluation reviewed his performance from March of 2008 through June of 2008, before Ernst & Young identified deficiencies in the department. This evaluation, completed by Roger Smith, indicated that Williams had no performance deficiencies and "meets expectations." (Docket No. 20, p. 9). Following the release of the FOL Internal Audit Blueprint for Improvement, however, supervisors Jimmy Woodall and Tony Crossland noticed that Williams was struggling to improve his work. His evaluation in August of 2009, completed by Crossland, indicated that he needed improvement in many areas, but that he nevertheless still "meets expectations." *Id.*. Following this review, Woodall noticed that Williams continued to lag behind his co-workers, and that Williams came to Woodall frequently in need of assistance. Williams's next evaluation, completed in January of 2010 by Crossland, indicated additional areas where Williams needed improvement. At this point, his overall rating was that of "needs improvement" as opposed to "meets expectations," because Crossland felt that his performance had not improved since August of 2009. In this evaluation, Crossland wrote, among other comments:

> [Williams has] difficulty evaluating the impact of observations that do not comply with the process control environment. Determining the implications of these occurrences and recommending improvements has also been an issue in reports David has initiated. He tends to recommend what he believes the reader wants to hear versus providing objective evaluations based on his audit findings. In summarizing his findings, he has difficulty clearly analyzing process flows and relating errors noted to the general population of like activities. Accordingly, it is often difficult for an objective reader to understand the basis of recommendations David might propose. In many cases, when challenged during the review process, analysis needed to be revised and recommendations ultimately altered. In these cases, additional time was needed for managerial review and rewriting of reports, which negatively impacted the department's productivity and efficiency levels.

(Docket No. 16).

Williams's wife has a medical condition that made her immune system susceptible to disease. He originally informed his supervisor about her condition in 2010, but requested no accommodations, and did not experience any adverse reactions. (Docket No. 20). In February of 2011, Williams told Woodall that he could not travel out of the country because of his wife's medical condition. Williams asked that the trip be rescheduled, but was unable to advise Woodall on when his wife would improve sufficiently to allow him to travel safely. (Docket No. 20). Woodall allowed Williams to miss the trip, but did not agree to reschedule it. Williams's wife improved and he was able to travel on the next audit trip.

Because Williams received a rating of "needs improvement," Woodall was required to initiate the Managing Performance Process for Salaried Employees ("MPI Process") for him. This process is designed to give employees whose performance is not in alignment with expectations a period of opportunity to improve. Woodall prepared an Employee Feedback Form with Crossland and Vickie Gibson, the senior director of human resources. The Form listed deficiencies in Williams's work and included eighteen examples to illustrate his problem areas. Woodall, Crossland, and Gibson met with Williams on June 2, 2011 to review the Form, however his performance had not improved sufficiently to conclude the MPI Process. He was then presented with a PIP Performance Improvement Plan, which constituted a final warning in

the Process. Williams was informed that his continued employment was not guaranteed. He was given the option to transition out of FOL with salary benefits for seven weeks, or to continue trying to improve by following a further action plan, with the knowledge that he could be terminated. Williams chose to stay, and attended nine weekly meetings from August 29, 2011 through November 15, 2011.

In November of 2011, Williams was still unable to improve his performance, and Gibson recommended to her supervisor George Fields, the Senior Vice President of Human Resources, that Williams' employment be terminated consistent with the MPI Process. (Gibson Dep., p. 26-27). FOL decided to eliminate Williams' senior manager position and restructure the Internal Audit Department, because it had a high number of senior managers as compared to lower-level auditors. (Newton Dep., p. 12). When Williams' senior manager position was eliminated, Williams' position was not filled but his duties were distributed within the Department. (Newton Dep., p. 18; Crossland Dep., p. 30-31; Cagle Dep., p. 36; Crossland Dep., p. 30-31). In terms of new hiring, the Department hired a staff auditor, Amanda Brown, in August 2011, before Williams was terminated. In February of 2012, FOL hired Corey Higgins as an entry-level staff auditor. The Department did not hire a new senior manager.

Plaintiff alleges that "Newton told [Williams] they were going to replace him with a less experienced person." (Pl. Dep.) Plaintiff interprets this "to mean someone younger." *Id.*. He claims that he "was replaced as senior manager in internal auditing by two staff auditors, one just out of school and the other with a few years' audit experience. [Williams] doesn't know their names but was at a restaurant last year and the audit department was there having lunch." *Id.*. Williams also alleges that, "after [he] was terminated up to five individuals were sent for training in OFAC indicating that up to five people were necessary to perform the job duties that Plaintiff

4

had been expected to do." Defendant notes that this information is inadmissible hearsay that it is unsupported by the record, but nevertheless explains that Charles Sanders, the Vice President of the Custom & Trade Compliance Department "decided that it would be beneficial for several within the department to attend the training and have some familiarity with the software since the cost of the training would be the same. None of the individuals who attended the training subsequently used the software . . . ." (Docket No. 20; Sanders Aff.).

Finally, in support of his claims, Williams alleges that many of his mistakes were due to computer formatting issues, Woodall's constant supervision and management style, and the tight deadlines outlined in his Plan. He alleges that he started working seven days a week to meet deadlines. (Docket No. 20). Williams told his supervisors that he could not quit because he needed the insurance for his wife. Finally, he alleges that Woodall came into his office once and said, "Well, I really don't want to hire Cagle, he's older than the other guys, they are forcing me to because these younger guys won't accept the position, they won't come to work for us." *Id.*. Defendants note that Woodall did hire Cagle, who was 62 at the time. (Docket No. 16).

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. S*ee Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the

case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute...." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), abrogated on other grounds by *Lews v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 1776 (2007).

## DISCUSSION

Plaintiff alleges: 1) disability discrimination in violation of the ADA; 2) age discrimination in violation of the ADEA; and 3) a violation of the Family and Medical Leave Act ("FMLA"). Because both Plaintiff and Defendant agree that Plaintiff has not alleged a prima facie case under the FLMA, the Court will not discuss that claim.

**I.     Disability discrimination claim under the ADA**

Plaintiff alleges for the first time in his Response to Defendant's Motion for Summary Judgment that his ADA claim is based on "associational discrimination." In support of this claim, he argues that he "is associated with his Wife who possesses a disability. Plaintiff made it

known that his wife had a disability by requesting the postponement of a trip. Defendant allowed Plaintiff to remain in the States instead of making the trip and then increased the demands on Plaintiff to unmanageable levels until he was unable to meet them and was subjected to termination." (Docket No. 20). Additionally, he notes that he mentioned his desire to continue working for FOL so that he could keep his healthcare benefits. In response, Defendant argues that: 1) Plaintiff has not asserted that his wife's condition was contagious or that FOL feared he may contract the illness; 2) Williams did not claim that he received any negative treatment as a result of informing FOL of her condition; 3) there is no evidence wife's illness had any bearing on FOL's decision to terminate Williams; and 4) according to Williams, FOL knew of his wife's condition more than a year prior to his termination.

The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). The Sixth Circuit first addressed § 12112(b)(4) associational discrimination claims in *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482 (6th Cir.2011). The *Stansberry* court held that where a plaintiff does not offer any direct evidence of discrimination, his claim must "be analyzed through a McDonnell Douglas-like burden-shifting test." 651 F.3d at 487. Under the formulation adopted by the Sixth Circuit, a plaintiff can make out a prima facie claim under § 12112(b)(4) by showing: (1) that he was qualified for the position; (2) that he was subject to an adverse employment action; (3) that he was known to be associated with a disabled individual; and (4) that the adverse employment action occurred under circumstances that raise a reasonable inference that the disability of the relative was a determining factor in the decision. *Id.* (applying *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir.1997)).

### A. Prima facie case

In the present case, Williams's associational discrimination claims fail because has not offered sufficient evidence to show that the decision to terminate his employment occurred under circumstances raising a reasonable inference that his wife's disability was a determining factor. On the contrary, the evidence of record reflects that Williams was terminated for his poor performance for FOL, as illustrated by his work evaluations. As the Sixth Circuit stated in *Stansberry*, "[a] plaintiff cannot bypass the prima facie showing requirement and must offer some evidence to suggest that the adverse employment action he . . . suffered was due in some measure to discriminatory animus before the employer is required to articulate a non-discriminatory reason for the action." 651 F.3d at 488–89 (citing R*eeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–48 (2000)). As Defendants argue, Williams own expression of need for medical insurance does not create an inference of associational discrimination. In regards to his inability to travel in February of 2011, after he had already received a "needs improvement" evaluation, he was permitted to skip the trip and did not provide any evidence of negative effects from this decision. The fact that FOL knew about his wife's illness a year before he was terminated, and that her illness improved, undercuts any inference that disability was a determining factor. There is simply nothing to indicate that Williams was terminated for any reason other than work performance, and Williams has failed to offer any evidence to create an inference that he was terminated on account of either his wife's disability or his association with her.

Even assuming that Williams could make out a prima facie case, FOL has offered a legitimate, nondiscriminatory reason for terminating him, and Williams has offered no evidence

showing that this reason is actually a pretext for unlawful discrimination. Thus, Defendant's Motion for Summary Judgment on Plaintiff's ADA claim is GRANTED.

## II. Age discrimination claim under the ADEA

Williams next alleges that his termination was based on his age. The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). As Williams has no direct evidence of age discrimination, the burden-shifting approach of McDonnell/Burdine applies. A plaintiff may make a prima facie case of age discrimination by showing: (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) after he was rejected, a substantially younger applicant was selected. *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir.2001); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-13 (1996) (stating "the prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion" and recognizing that, in the age-discrimination context, "such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger"); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003); *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1991).

If the plaintiff makes this prima facie showing, then "the burden of production shifts to the defendant to articulate a nondiscriminatory reason for its action." *Harris v. Metro. Gov't of Nashville & Davidson County*, 594 F.3d 476, 485 (6th Cir.2010) (citing *Burzynski*, 264 at 622). If the defendant does so, then "the burden of production shifts back to the plaintiff to show that the employer's proffered reason was mere pretext for intentional age discrimination." *Id*. (citing

*Burzynski*, 264 at 622). "The plaintiff retains the ultimate burden of proving that 'age was the "but-for" cause of the employer's adverse action.'" *Id*. (quoting *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 167 (2009)).

### A. Prima facie case

Because Williams was over the age of forty during the time frame relevant to this lawsuit, he falls within the class of individuals protected pursuant to the ADEA. Additionally, the Court holds that Williams suffered an "adverse" employment action when he was terminated.

As to the third element requiring that Plaintiff be "qualified" for the position, Defendants argue that Williams's poor performance reviews indicate that he was unqualified. In determining whether an individual is considered "qualified" for a position, "the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 576 (6th Cir. 2003) (en banc). "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id.* at 574-75 (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir.2000)). Here, Williams had the requisite experience and training to be considered qualified for his position. Defendant's arguments regarding his poor performance are relevant not to Williams's qualifications, but to FOL's legitimate, non-discriminatory reason for his termination. *See also Kumas v. Aldrich Chemical Co., Inc.*, 911 F. Supp. 2d 571, 587 (S.D. Oh. 2012).

As to the fourth element of the prima facie case, Williams must show that he was replaced by a younger employee. In support, Williams alleges that: 1) he was told he would be replaced by someone less experienced; 2) that he, a senior manager, was replaced by two unnamed staff auditors; and 3) he heard from an unknown source that five employees were sent to OFAC training. (Docket No. 20). In response, Defendant notes that Williams's senior manager position was eliminated, and his duties were distributed within the Department. (Newton Dep., p. 18; Crossland Dep., p. 30-31; Cagle Dep., p. 36; Crossland Dep., p. 30-31). Williams has not satisfied his burden of proving that he was replaced with a younger employee. He relies only on his own allegations and these are without support. On the contrary, Defendant has shown that Williams's senior management position was actually eliminated and his duties redistributed among employees. Thus, Williams has not put forth a prima facie case.

Furthermore, even if Williams could prove his prima facie case of age discrimination, he has not shown that Defendant's proffered reason for terminating him was mere pretext for intentional age discrimination. Defendant states that Williams's employment was terminated due to unsatisfactory job performance that did not improve, despite being given multiple opportunities. A plaintiff may prove pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co*., 231 F.3d 1016, 1021 (6th Cir.2000). Defendant has provided substantial evidence of Williams's inadequate work performance and of the warnings given to him. Williams has not provided any information, aside from one isolated comment made in regards to a different employee, that Defendant's articulated reason for ending Williams employment was merely pretext for discrimination. Thus, Defendant's Motion for Summary Judgment as to the ADEA claim is GRANTED.

## CONCLUSION

For these reasons, the Defendants' Motion for Summary Judgment (Docket #16), is **GRANTED**.  An appropriate Judgment shall issue.


cc: Counsel